UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| CHARISSE LYNETTE FORD,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE,<br>COMMISSIONER OF SOCIAL<br>SECURITY ADMINISTRATION,<br><br>Defendant. | No. ED CV 11-1453-PLA<br><br><br><br>**MEMORANDUM OPINION AND ORDER** |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on September 19, 2011, seeking review of the Commissioner's denial of her applications for Disability Insurance Benefits and Supplemental Security Income payments. The parties filed Consents to proceed before the undersigned Magistrate Judge on September 28, 2011, and October 3, 2011. Pursuant to the Court's Order, the parties filed a Joint Stipulation on May 30, 2012, that addresses their positions concerning the disputed issues in the case. The Court has taken the Joint Stipulation under submission without oral argument.

## II.

## BACKGROUND

Plaintiff was born on January 4, 1977. [Administrative Record ("AR") at 50-51.] She completed one year of college [AR at 175], and has past relevant work experience as a customer service representative, sales associate, office clerk, hostess, auditor, loan processor, warehouse worker, dental assistant, and forest aide technician. [AR at 161-68.]

On October 15, 2007, plaintiff protectively filed her application for Supplemental Security Income payments and filed her application for Disability Insurance Benefits, alleging that she has been unable to work since September 5, 2007, due to cardiomyopathy following a stroke, heart problems, hypertension, high blood pressure, non-insulin dependent diabetes, obesity, headaches, dizziness, drowsiness, shortness of breath, fatigue, coughing, stomach cramps, leg pain, swelling in her legs, numbness in her arms, legs, and feet, and short-term memory loss. [AR at 50-51, 72-73, 129-36, 142-48, 169-76.] After her applications were denied initially and on reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). [AR at 68-73, 77-81.] A hearing was held on June 9, 2010, at which time plaintiff appeared with counsel and testified on her own behalf. [AR at 26-49.] A vocational expert also testified. [AR at 44-48.] On June 25, 2010, the ALJ determined that plaintiff was not disabled. [AR at 8-16.] On July 19, 2011, the Appeals Council denied plaintiff's request for review. [AR at 1-3, 21.] This action followed.

## III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." Moncada, 60 F.3d at 523; see also Drouin, 966 F.2d at

1257. When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. Drouin, 966 F.2d at 1257; Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). Where the evidence is susceptible to more than one rational interpretation, the Court must defer to the decision of the Commissioner. Moncada, 60 F.3d at 523; Andrews v. Shalala, 53 F.3d 1035, 1039-40 (9th Cir. 1995); Drouin, 966 F.2d at 1258.

## IV.
## THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); Drouin, 966 F.2d at 1257.

**A.  THE FIVE-STEP EVALUATION PROCESS**

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995, as amended April 9, 1996). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied. Id. If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied. Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded. Id. If the claimant's impairment or combination of impairments does not meet or equal an impairment

in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled and the claim is denied. Id. The claimant has the burden of proving that she is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets this burden, a prima facie case of disability is established. The Commissioner then bears the burden of establishing that the claimant is not disabled, because she can perform other substantial gainful work available in the national economy. The determination of this issue comprises the fifth and final step in the sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

**B.    THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

In this case, at step one, the ALJ found that plaintiff had not engaged in any substantial gainful activity since her alleged disability onset date, September 5, 2007. [AR at 10.][1] At step two, the ALJ concluded that plaintiff has the severe impairments of congestive heart failure, hypertension, obesity, and headaches. [Id.] At step three, the ALJ determined that plaintiff's impairments do not meet or equal any of the impairments in the Listing. [AR at 11.] The ALJ further found that plaintiff retained the residual functional capacity ("RFC")[2] to perform "light work" as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b).[3] Specifically, the ALJ found that plaintiff "can lift and/or carry 10 pounds frequently and 20 pounds occasionally; sit, stand and/or walk for six hours out of an eight-hour workday; occasionally climb ramps and stairs; and balance, stoop, kneel, crouch and crawl." [AR at 12.] The ALJ also found that plaintiff "is precluded from climbing

---

[1]    The ALJ concluded that plaintiff meets the insured status requirements of the Social Security Act through September 30, 2012. [AR at 10.]

[2]    RFC is what a claimant can still do despite existing exertional and nonexertional limitations. See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

[3]    20 C.F.R. §§ 404.1567(b) and 416.967(b) define "light work" as work involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and requiring "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls."

4

ladders, ropes or scaffolds." [Id.]  At step four, the ALJ concluded that plaintiff is capable of performing her past relevant work as a cashier, a hostess, and a day care worker.  [AR at 15.]  Accordingly, the ALJ determined that plaintiff has not been under a disability from September 5, 2007, to June 25, 2010, the date of the decision.  [AR at 16.]

## V.

## THE ALJ'S DECISION

Plaintiff contends that the ALJ failed to properly: (1) consider the relevant medical evidence of record, and (2) evaluate plaintiff's credibility.  [Joint Stipulation ("JS") at 3.]  As set forth below, the Court the Court agrees with plaintiff, in part, and remands the matter for further proceedings.

**PLAINTIFF'S SUBJECTIVE SYMPTOM TESTIMONY**

Plaintiff contends that the ALJ failed to properly evaluate her subjective symptom testimony. [JS at 20-24.]

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis."  Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  Id. (quoting Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).  Second, if the claimant meets the first test, the ALJ may only reject the claimant's testimony about the severity of her symptoms upon (1) finding evidence affirmatively suggesting that the claimant was malingering, or (2) offering specific, clear and convincing reasons for doing so.  See Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1999); see also Lingenfelter, 504 F.3d at 1036; Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003).  The factors to be considered in weighing a claimant's credibility include: (1) the claimant's reputation for truthfulness; (2) inconsistencies either in the claimant's testimony or between the claimant's testimony and her conduct; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties concerning the nature, severity, and effect of the

symptoms of which the claimant complains. See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002); see also 20 C.F.R. §§ 404.1529(c), 416.929(c). If properly supported, the ALJ's credibility determination is entitled to "great deference." See Green v. Heckler, 803 F.2d 528, 532 (9th Cir. 1986).

On January 1, 2008, plaintiff completed an Exertional Daily Activities Questionnaire. [AR at 154-56.] In the Questionnaire, plaintiff indicated that she lives in a house with friends. [AR at 154.] When asked how her symptoms prevent her from carrying out her normal workday, she stated: "dizziness, through the day, nausea, numbness ... of feet and legs at time[s]," and "headache[s]." [Id.] When asked "what kinds of things [she] do[es] on an average day and how these activities make [her] feel," she stated: "walking, standing up I get real dizzy so I have to lay down." [Id.] The Questionnaire also asked, "How far do you walk and how long does it take you to walk this distance? Explain how you feel after walking this distance." In response, plaintiff reported, "walk sometime[s] if I[']m out, mainly get dizzy, headache, get tired." [Id.] Plaintiff also represented that she cannot climb stairs. [AR at 155.] Next, the Questionnaire asked, "What kind of things can you lift? How often?" to which plaintiff responded, "some small boxes, bags of grocer[ies] -- every so often." [Id.] As to carrying items, the form inquired, "What kind of things can you carry? How far? How often?" to which plaintiff responded, "bags of grocer[ies] -- from the car to the house -- every so often." [Id.] The Questionnaire also asked whether plaintiff cleans her own home or living area, and stated that if the answer was "yes," plaintiff should list the chores she does and how long it takes her to do them. [Id.] As to that question, plaintiff answered, "wash dishes, and wash clothes." [Id.] In addition, the Questionnaire asked: "Did you do any of the above chores before you became disabled?" and further asked, "If YES, are there any differences in the way you now do these chores and how the effort of doing them affects you." [AR at 156.] Plaintiff indicated that the answer to this question was "Yes," and also stated, "yard work, walking more often, and lifting, now -- headache, dizziness, nausae [sic]." [Id.] Next, the form asked if plaintiff "ha[s] any difficulty finishing any of [her] housework and other chores," and "If so, how long can you continue until you have to stop? What stops you?" [Id.] Plaintiff answered, "Yes," and stated, "maybe a[n] h[ou]r, get tired easy [sic]." [Id.] Finally, as to going out, the form asked

6

whether plaintiff does her own grocery shopping and, if so, how often. Plaintiff stated in response, "Yes," and "sometime I get tired easy [sic]." [AR at 155.]  When asked whether she drives and how far she can drive at one time, plaintiff answered, "Yes" and "10-20 min[ute] drive or a[n] h[ou]r if I have to." [Id.]

At plaintiff's June 9, 2010, administrative hearing, she testified that as a result of her heart condition beginning two years earlier, she gets "shortness of breath" and "get[s] real tired." [AR at 34.] She testified that beginning "six months or so" before the hearing, she has had to lie down for three hours each day due to headaches and dizziness, and that if she "feel[s] like [she is] doing too much," she will sleep more than three hours. [AR at 35.] She stated that before the six months prior to the hearing, she "was tired, but not to the point where [she] would lay down and relax." [Id.] Plaintiff represented that she gets shortness of breath "every day if [she is] doing too much," for example, if she walks for half a block. [See AR at 35-36.] She also represented that when she becomes short of breath, she stops to catch her breath. [AR at 36.] Plaintiff testified that at least four times a week, she gets dizzy and has to lie down. [Id.] She further testified that she gets headaches "mostly every day" that last for 30 minutes at a time, for which she takes Tylenol. [Id.] Plaintiff stated that "at times," she has swelling in her legs, which is exacerbated by standing for "a long time," and for which she has to prop up her legs about four times a week. [AR at 43.] Plaintiff represented that she still has numbness in her hands, arms, and legs from her stroke in 2007, and that since her stroke, it has been difficult for her "to remember things," such as what she needs from the grocery store or "what someone was talking about." [AR at 42-43.] Plaintiff also represented that her worst symptoms are her fatigue, dizziness, and shortness of breath. [AR at 36-37.] As to daily activities, plaintiff testified that she "do[es] light stuff around the house," such as washing dishes, vacuuming, doing the laundry, and "cook[ing] light stuff for [her]self," but that "if [she is] too tired with that, [she] stop[s] and do[es] it later on." [AR at 39.] She further testified that about three to four times a week, she "feel[s] like [she is] doing too much," which will cause "[s]hortness of breath, [her] heart beating fast[,] or tightness." [AR at 38-39.] Plaintiff stated that both her mother and brother live with her, that her mother does the cooking (or plaintiff cooks "light stuff" for herself), and that her brother helps her with "[m]opping, sweeping,

[and] washing dishes at times." [AR at 39.] Plaintiff also stated that on a typical day, she will "do some light housework, wash dishes [and] [her] clothes[,] [and] [c]ook something to eat." [AR at 40.] When the ALJ asked plaintiff whether she "ever ha[s] days where [she] can just go all day and get a lot of things done," plaintiff stated: "No. My mom normally helps me out or she finishes whatever I don't complete." [AR at 39.] Plaintiff represented that she and her mother both do the grocery shopping, but when asked whether she is able to walk around the store and pick up her groceries, plaintiff stated: "For a little bit. I might pick up little things and come back and [my mother] might go and get the balance of it later on." [AR at 39-40.] Plaintiff also represented that she only goes out to go to the store or to a doctor appointment, and that either she or her mother will drive to the appointments. [AR at 40.]

At step one of the two-step credibility analysis, the ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms." [AR at 13.] The ALJ nevertheless concluded that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [ALJ's RFC findings for plaintiff]." [Id.]

At step two, the ALJ appeared to find that plaintiff was malingering, stating that her "description of the severity of [her] pain has been so extreme as to appear implausible," and that her "allegations of constant shortness of breath, fatigue, headaches and dizziness are inconsistent with the objective medical evidence[,] which indicates an attempt by [plaintiff] to exaggerate the severity of her symptoms." [AR at 12-13.]

As to these conclusions by the ALJ, the Court first notes that it was improper for the ALJ to rely on any perceived inconsistencies between plaintiff's statements and the medical evidence to conclude that plaintiff was malingering. "[A] claimant need not produce objective medical evidence of the pain or fatigue itself, or the severity thereof." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996); see Johnson v. Shalala, 60 F.3d 1428, 1433 (9th Cir. 1995) ("once an impairment is medically established, the ALJ cannot require medical support to prove the severity of the pain"). The Commissioner considers both pain and fatigue to be subjective symptoms, and analyzes testimony concerning them using the same two-step analysis. See 20 C.F.R. §§

404.1529(b); 416.929(b) ("Your symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present."); see also Blakeman v. Astrue, 509 F.3d 878, 879 (8th Cir. 2007) ("Fatigue is one of the subjective symptoms that must be considered when ... it is cited by a claimant as a cause of his disability and a medically determinable impairment 'could reasonably be expected to produce' that symptom." (quoting 20 C.F.R. §§ 404.1529(b); 416.929(b))). The case law holding that "[a] claimant need not produce objective medical evidence of the pain or fatigue itself, ... the severity thereof," or a causal relationship between the impairment and the symptom(s), reflects the rationale that "pain testimony may establish greater limitations than can medical evidence alone." Smolen, 80 F.3d at 1282 (internal citations omitted); Burch v. Barnhart, 400 F.3d 676, 680 (9th Cir. 2005) (citing Social Security Ruling[4] 96-7p). The Ninth Circuit has noted that "the nature of pain and other such symptoms" is "highly subjective and idiosyncratic" such that "[t]he amount of pain [or fatigue] caused by a given physical impairment can vary greatly from individual to individual." Smolen, 80 F.3d at 1282 (internal citations omitted). While an ALJ may consider whether a lack of objective medical evidence supports the degree of limitation, this "cannot form the sole basis for discounting pain testimony." Burch, 400 F.3d at 681. Thus, the ALJ's finding that plaintiff's subjective symptom testimony was inconsistent with the objective medical evidence did not exempt the ALJ from being required to offer "specific, clear and convincing reasons" to reject that testimony. See Lingenfelter, 504 F.3d at 1036.

Moreover, the Court finds that the evidence in the record does not support a conclusion that plaintiff was exaggerating her symptoms. A consultative examiner who performed an internal medicine consultation on plaintiff on March 12, 2008, stated that plaintiff was "a fair historian." [See AR at 191-94.] Similarly, a physician who performed a Case Analysis for plaintiff on April 25,

---

[4] Social Security Rulings ("SSR") do not have the force of law. Nevertheless, they "constitute Social Security Administration interpretations of the statute it administers and of its own regulations," and are given deference "unless they are plainly erroneous or inconsistent with the Act or regulations." Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989).

1  2008, noted no inconsistencies between plaintiff's allegations and her medical reports, and also
2  stated as to plaintiff's credibility that there were "no apparent significant discrepancies." [See AR
3  at 498-99.] In contrast, despite the ALJ's conclusion that plaintiff was exaggerating her subjective
4  symptoms, the ALJ did not point to <u>any</u> evidence in the record that any physician or other
5  eyewitness suggested plaintiff was malingering. See, e.g., <u>Swenson v. Sullivan</u>, 876 F.2d at 687,
6  688 (9th Cir. 1989) ("no doctor suggested that [the plaintiff] was malingering"); <u>Dodrill</u>, 12 F.3d at
7  918-19 ("[a]lthough eyewitnesses have to rely to some extent on communications with the claimant
8  in ascertaining whether she is disabled or malingering, we have held that friends and family
9  members in a position to observe a claimant's symptoms and daily activities are competent to
10 testify as to her condition"); <u>Gallant v. Heckler</u>, 753 F.2d 1450, 1455 (9th Cir. 1984) ("[n]o witness,
11 qualified or otherwise, expressed the opinion that [the plaintiff] was in any way malingering").

12      Lastly, contrary to the ALJ's assertion, the record *does* contain evidence of medical reports
13 and examination findings that supports plaintiff's allegations concerning the severity of her
14 impairments. On September 8, 2007, plaintiff was admitted to the emergency room at St. Mary
15 Medical Center, where her chief complaint was shortness of breath. [AR at 519, 527.] A
16 radiological examination of her chest revealed "moderately severe biventricular cardiomegaly
17 without pulmonary edema or effusion." [AR at 528.] The reading physician noted the following
18 as his impression of the examination results: "[c]ardiomegaly, highly suggestive of cardiomyopathy
19 ... [c]annot rule out pericardial effusion." [Id.] Instructions issued to plaintiff by St. Mary Medical
20 Center on the same day stated: "Your exam shows that you have congestive heart failure. ...
21 Symptoms of congestive failure can include shortness of breath with mild exercise or when lying
22 flat in bed, coughing, wheezing, abnormal swelling in the feet and legs, loss of appetite, and chest
23 or abdominal pain." [AR at 534-36.] One month later, on October 7, 2007, paramedics brought
24 plaintiff to the St. Mary Medical Center emergency room again because she had an "altered level
25 of consciousness" when they made contact with her. [AR at 549.] Plaintiff was admitted to the
26 medical center for four days while tests were performed, including a 2-D echocardiogram, which
27 "show[ed] ejection fraction of only 5%." [Id.] The echocardiogram reading physician
28 recommended that plaintiff be placed "in the heart transplant program for [a] cardiac transplant."

[Id.] Upon discharge, plaintiff's diagnoses were end-stage cardiomyopathy, severe mitral and tricuspid insufficiency, left-sided stroke, diabetes, hypertension, and morbid obesity. [Id.] On March 12, 2008, an examining physician performed an internal medicine consultation on plaintiff, which included a physical examination and a neurological examination. [AR at 502-07.] He also noted diagnostic studies performed on plaintiff, and stated the following concerning an electrocardiogram: "Test results show sinus rhythm possible reversal of the arm leads abnormal right axis deviation consider right ventricular hypertrophy QRS (T) contour abnormality consistent with high lateral infarct consider inferior infar[c]t." [AR at 506.] The examining physician diagnosed plaintiff with hypertension, diabetes, and congestive heart failure. [AR at 507.] In both March and April 2008, physicians at the High Desert Community Care Center noted that plaintiff had a cardiac transplant pending. [See AR at 275-76.] On August 27, 2008, plaintiff received a physical evaluation performed by a nurse practitioner, who found upon physical examination that plaintiff had shortness of breath and that plaintiff's gait and station were not within normal limits, but were "slow [and] deliberate as [plaintiff] is dizzy a lot." [See AR at 223-25.] The nurse also noted that a computed tomography angiography revealed wheezing in the right upper quadrant of plaintiff's abdomen. [See AR at 224.] She diagnosed plaintiff with coronary artery disease, congestive heart failure, and shortness of breath, among other things. [See AR at 225.] When asked whether it was "reasonable to expect the diagnosed medical condition[s] to produce [plaintiff's] reported symptoms," which included shortness of breath, dizziness, headaches, and numbness, the nurse answered, "Yes." [AR at 223-24.] An echocardiogram ("ECG") performed on the same day reflected "[s]inus bradycardis[;] [l]eft ventricular hypertrophy with QRS widening[;] and T wave abnormality, consider lateral ischemia," and a typed note on the ECG report stated, "[a]bnormal ECG." [AR at 248.] On October 2, 2008, another ECG was performed, which revealed "[m]ild left ventricular dilation," "[m]oderate global left ventricular hypokinesis," and "[m]ild global right ventricular hypokinesis." [AR at 203-04.] Finally, on October 13, 2008, a physician physically examined plaintiff and stated that: "Although her cardiomyopathy is not as severe as it appeared on her echocardiogram in 2004, she still has a low ejection fraction, which is unexplained. I have recommended that she undergo a diagnostic cardiac catheterization to

1  evaluate for coronary artery disease." [AR at 205-07.] The physician's progress note reflected
2  that plaintiff consented to the right and left heart catheterization. [See AR at 207.] Thus, even if
3  the ALJ could rely on a lack of objective medical evidence to find that plaintiff was malingering,
4  substantial evidence does not support her finding that plaintiff's allegations concerning the severity
5  of her symptoms were inconsistent with the medical evidence in the record.

6  Accordingly, the ALJ was required to offer "specific, clear and convincing reasons" for
7  rejecting plaintiff's subjective symptom testimony. See Lingenfelter, 504 F.3d at 1036. "General
8  findings are insufficient; rather, the ALJ must identify what testimony is not credible and what
9  evidence undermines the claimant's complaints." Reddick v. Chater, 157 F.3d 715, 722 (9th Cir.
10 1998) (quoting Lester, 81 F.3d at 834); see also Dodrill, 12 F.3d at 918.

11 Apart from plaintiff's purported exaggeration of the severity of her symptoms, the ALJ
12 rejected plaintiff's credibility because she found that: (1) "[t]he treatment records reveal [that
13 plaintiff] received routine and conservative treatment since the alleged onset date," and (2)
14 plaintiff's "description of symptoms [in an Exertional Daily Activities Questionnaire] has been quite
15 vague and general." [AR at 12-13.]

16 The ALJ's characterization of plaintiff's treatment as "routine and conservative ... since the
17 alleged onset date" was an improper reason to discount her credibility. The record reflects that
18 plaintiff was consistently on a variety of medications during the period of her alleged disability,
19 including Carvedilol, Vasotec, Cordarone, Aldactone, and Coumadin in March 2008 [AR at 502-
20 03], Aldactone, Amiodarone, Carvedilol, Coumadin, and Enalapril in September 2008 [AR at 199-
21 200], Aldactone, Amiodarone, Carvedilol, Coumadin, Levoxyl, and Vasotec in October 2009 [AR
22 at 654], and Aldactone, Amiodarone, Carvedilol, Coumadin, Levoxyl, Vasotec, Enalapril,
23 Glyburide, and Metformin in December 2009. [AR at 663.] Moreover, as noted supra, plaintiff was
24 hospitalized in connection with her congestive heart failure at least once after her alleged onset
25 date of September 5, 2007. Finally, also as noted supra, physicians who examined plaintiff
26 recommended that she undergo a diagnostic cardiac catheterization, as well as a cardiac
27 transplant. At plaintiff's hearing before the ALJ, she testified that she had an upcoming
28 appointment on June 17, 2010 (i.e., about one week after the hearing), to see a cardiologist

regarding the cardiac transplant. [AR at 41-42.] The ALJ pointed to nothing in the record to show that any specific treatment <u>in</u> <u>addition</u> to the treatment plaintiff was receiving is a standard method of treating her impairments. [<u>See</u> AR at 12-13.] Indeed, while plaintiff had not yet received a heart transplant, her doctors consistently recommended such a procedure, which the Court does not find is accurately characterized as "routine and conservative." [<u>See</u> AR at 13.] Moreover, there is no evidence in the record from any physician that plaintiff failed to pursue any other treatment that would have alleviated her symptoms. <u>See</u>, <u>e.g.</u>, <u>Lapeirre-Gutt v. Astrue</u>, 382 Fed.Appx. 662, 664 (9th Cir. 2010) (citable for its persuasive value pursuant to Ninth Circuit Rule 36-3) ("A claimant cannot be discredited for failing to pursue non-conservative treatment options where none exist."). Thus, this reason given by the ALJ to reject plaintiff's credibility was neither clear nor convincing. <u>See</u> <u>Lingenfelter</u>, 504 F.3d at 1036; <u>see</u> <u>also</u> <u>Bunnell</u>, 947 F.2d at 346.

   Next, the ALJ rejected plaintiff's credibility because she concluded that plaintiff's description of her symptoms in the January 1, 2008, Exertional Daily Activities Questionnaire were "quite vague and general, lacking the specificity which might otherwise make it more convincing." [AR at 12.] The Court agrees with the ALJ that some of plaintiff's answers to the questions on the form were lacking in specificity. Nevertheless, the Court is not persuaded that plaintiff's responses were so vague as to make her statements incredible, especially in light of her hearing testimony, which elaborated on and filled in the most vague of plaintiff's responses in the questionnaire. For example, when plaintiff was asked on the form "what kinds of things [she] do[es] on an average day and how these activities make [her] feel," she stated: "walking, standing up I get real dizzy so I have to lay down." [AR at 154.] At her hearing, however, plaintiff testified that on a typical day, she will "do some light housework, wash dishes [and] [her] clothes[,] [and] [c]ook something to eat" [AR at 40], but that when she becomes "too tired," she will stop and continue the chore at a later time. [AR at 39.] Next, when the questionnaire asked how far plaintiff walks, how long it takes her to walk that distance, and how she feels after walking that distance, plaintiff stated: "walk sometime[s] if I[']m out, mainly get dizzy, headache, get tired." [AR at 154.] Nevertheless, plaintiff testified at the hearing that she gets shortness of breath when she walks for half a block. [<u>See</u> AR at 35-36.] Third, plaintiff was asked what chores she does and how long it takes her to do them,

to which she merely responded, "wash dishes, and wash clothes." [AR at 155.] Even so, plaintiff testified at her hearing that she "do[es] light stuff around the house," such as washing dishes, vacuuming, doing the laundry, and "cook[ing] light stuff for [her]self," but that "if [she is] too tired with that, [she] stop[s] and do[es] it later on," and that she does not have days where she can perform such tasks all day and "get a lot of things done," but relies on her mother to help her complete what she cannot finish. [AR at 39.] Finally, the form asked whether plaintiff does her own grocery shopping and, if so, how often, to which plaintiff answered in the affirmative and stated, "sometime[s] I get tired easy [sic]." [AR at 155.] Plaintiff's hearing testimony supplemented this response, however, as plaintiff testified that she can only walk around the store and pick up her groceries "[f]or a little bit," and that "[she] might pick up little things and come back and [her mother] might go and get the balance of it later on." [AR at 40.] In light of these statements in plaintiff's hearing testimony, substantial evidence does not support the ALJ's conclusion that plaintiff's responses in the questionnaire were so vague and general as to preclude them from being "convincing." [See AR at 12.] Moreover, the ALJ did not point to any evidence that plaintiff has a reputation for lying, did not identify any inconsistencies in plaintiff's allegations concerning the severity of her pain and fatigue, and did not discuss any other evidence indicating that plaintiff's testimony appeared less than candid. See Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (one factor to consider in weighing a claimant's credibility includes "ordinary techniques of credibility evaluation, such as a claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid"). While defendant in the Joint Stipulation attempts to identify inconsistencies among plaintiff's statements concerning her subjective symptoms [see JS at 26], the Court's review is limited to the reasons actually cited by the ALJ in support of her determination. See Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003) ("It was error for the ... court to affirm the ALJ's ... decision based on evidence that the ALJ did not discuss."). "We are constrained to review the reasons the ALJ asserts." Id. (citing Pinto v. Massanari, 249 F.3d 840, 847-48 (9th Cir. 2001)).

The ALJ offered no legally adequate reason to discount plaintiff's credibility.  Remand is warranted on this issue.[5]

## VI.

## REMAND FOR FURTHER PROCEEDINGS

As a general rule, remand is warranted where additional administrative proceedings could remedy defects in the Commissioner's decision.  See Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir.), cert. denied, 531 U.S. 1038 (2000); Kail v. Heckler, 722 F.2d 1496, 1497 (9th Cir. 1984).  In this case, remand is appropriate to properly evaluate plaintiff's subjective symptom testimony.  The ALJ is instructed to take whatever further action is deemed appropriate and consistent with this decision.

Accordingly, **IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED: August 9, 2012

                                                  PAUL L. ABRAMS
                                    UNITED STATES MAGISTRATE JUDGE

---

[5]  The Court exercises its discretion not to address herein plaintiff's first contention of error.

15